Dora R. CUDNEY, Appellant,

v.

BRANIFF AIRWAYS, Incorporated, and Clyde Elmer Luckhurst, Respondents.

No. 45466.

Supreme Court of Missouri,

Division No. 1.

March 11, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied April 8, 1957.

Coburn & Croft, Thomas L. Croft, William B. Eldridge, St. Louis, for appellant.

Lashly, Lashly & Miller, John H. Lashly, Grove G. Sweet, St. Louis, for respondents.

VAN OSDOL, Commissioner.

This is an action for damages for personal injuries sustained by plaintiff Dora R. Cudney, a passenger, when she was thrown from her seat in aircraft belonging to the original defendant Midcontinent Airlines, Inc., a commercial airline engaged in the transportation of persons for hire, and piloted by defendant Clyde Elmer Luckhurst. The airplane, a DC–3, was in flight from Kansas City, Missouri, to Omaha, Nebraska. When the plane was near Tarkio, Missouri, it was flown into a thunderstorm with lightning and rain; encountered a severe and unusual downdraft; and suddenly dropped about one hundred feet.

Since the institution of the action, defendant Midcontinent Airlines, Inc., merged with Braniff Airways, Incorporated, which latter and surviving corporation assumed the liabilities and obligations of the former and upon motion was substituted as a party defendant for and instead of the former defendant, Midcontinent.

A jury returned a verdict for plaintiff, assessing her damages at $20,000; but the trial court set aside the verdict and judgment for plaintiff, and entered judgment for defendants in accordance with defendants' motion for a directed verdict. Plaintiff has appealed.

Plaintiff's case was submitted to the jury in plaintiff's verdict-directing Instruction No. 2 on specific negligence of defendants (1) in flying the airplane into a storm when defendants could and should have deviated the course of the plane so as to avoid the storm and downdraft therein; (2) in flying the plane for several minutes in the storm and until the downdraft was encountered at a high, excessive and dangerous rate of speed in the circumstances; and (3) in failing to instruct plaintiff, who was inexperienced in air travel, that in rough and turbulent weather, a passenger or his hands or some other object may be

so thrown about as to cause the safety seat belt to become unfastened.

The three theories of specific negligence were submitted in the conjunctive.

A former trial of this cause, on the theory of *res ipsa loquitur,* resulted in a judgment for defendant rendered on a directed verdict for defendant Luckhurst and a jury finding and verdict for defendant Midcontinent; and upon plaintiff's appeal it was held by this court that the doctrine of *res ipsa loquitur* did not apply in the circumstances shown in evidence in the former trial; but, for reasons stated in this court's former opinion, the judgment for defendants was reversed and the cause remanded that plaintiff might plead specific negligence, if so advised. Cudney v. Midcontinent Airlines, 363 Mo. 922, 254 S.W. 2d 662.

Herein, upon instant appeal, plaintiff-appellant contends that the trial court erred in setting aside the verdict and judgment for plaintiff and in entering judgment for defendants; and that the verdict and judgment for plaintiff should be reinstated. It is asserted that the evidence considered from a standpoint favorable to plaintiff was substantial and sufficient to make out a case of negligence of defendants supporting each of the three conjunctive submissions of specific negligence as submitted in Instruction No. 2.

On the other hand, defendants-respondents contend that the evidence was insufficient to support any submission; and that the trial court correctly set aside the verdict and judgment for plaintiff. It is said the evidence shows defendant pilot could not see the storm and could not have foreseen that a downdraft would likely be encountered by the aircraft when moving into and through the stated area of turbulent air, and, therefore, defendants were not guilty of negligence in failing to circumnavigate the stormy concentration in the area, or in flying at high and undiminished speed through the storm. Also, defendants-respondents assert the evidence shows but the merest possibility that a seat belt when buckled may be unbuckled and undone by the "throwing about" of the passenger or his hands or other objects by the turbulence of air encountered in flight.

■■ Since plaintiff's three theories of specific negligence were submitted conjunctively, the submission of plaintiff's case was not reversibly erroneous if any one (or two) of the three conjunctively submitted theories of specific negligence was supported by substantial evidence. Corley v. Kroger Grocery & Baking Co., 355 Mo. 4, 193 S.W.2d 897, and cases therein cited; Palmer v. Lasswell, Mo.Sup., 287 S.W.2d 822. And, in ruling the question of the submissibility of a plaintiff's case, the appellate court considers the evidence in the light most favorable to plaintiff. The evidence favorable to plaintiff, including that introduced by defendant, is considered as true, and plaintiff is given the benefit of every reasonable inference therefrom; and defendant's evidence, unfavorable to plaintiff, is disregarded. Boyd v. Terminal R. Ass'n of St. Louis, Mo.Sup., 289 S.W. 2d 33.

There was evidence from which a jury reasonably could infer that plaintiff, desiring to go to Minneapolis, bought a ticket for transportation in a flight of defendants' aircraft scheduled to depart from Kansas City for Minneapolis via Omaha at two fifty-five in an early September morning. There was a slight delay, but the plane started taxiing at three-nineteen and was airborne at three twenty-three. Although it had been raining, the take-off was routine; but "as time progressed" the air began to get turbulent and the plane "bounced around"; and "some time after" it got "very rough and turbulent." Continuing to a point near Tarkio there was "cloud-to-cloud" lightning, and some "cloud-to-ground" lightning. It began to rain. After the rain was encountered, the airplane continued on in direct flight for several minutes at the rate of one hundred eighty-seven miles per hour (ground speed). There were "several minutes of rain, * *

and then, all of a sudden, we hit a severe down-draft." The plane dropped "possibly one hundred feet." After this occurrence, the pilot made a ninety-degree turn to the right, reduced the speed of the plane to 120–130 miles per hour, and, having been flown in the new direction eight or nine miles, the plane encountered no more rough air.

When plaintiff had boarded the plane, she had selected seat number 12 in the tier of single seats on the right-hand side of the airplane. Across the aisle to the left, a Mrs. Cohen occupied seat number 10, a seat next to the window in the tier of double seats on the left-hand side of the plane. The seat on Mrs. Cohen's right next to the aisle was unoccupied. The "fasten seat belt" signal was "on" when plaintiff boarded the plane and was on from the time the plane left the Kansas City airport until the severe downdraft was encountered. When the "severe jolt" occurred, plaintiff was thrown upward and across the aisle to her left. She fell on Mrs. Cohen, who, as stated, was seated on the extreme left in the plane. The "doped" fabric headliner (ceiling) of the passenger compartment was depressed and damaged at two points; and the metal rail of the luggage rack on the left side of the plane in the vicinity of but opposite to seat number 12 was "dented," that is, bent out of line an inch and a half to two inches. It may be readily inferred that the damage to the headliner and to the rail of the luggage rack had been caused by the contact of plaintiff's head and body. Three $\frac{3}{16}$-inch chrome alloy steel bolts of the forty like bolts on either side serving to attach the fuselage to the center sections of the wings were sheared off—"they would be right directly" at seat number 10. The cabin floor covering was unsnapped, and one floor-board "came up about an inch * * * about where Mrs. Cudney's seat was."

■ (It is urged by defendants-respondents that the evidence shows a signal and instructions were given passengers to secure themselves in their seats by seat belts; and,

this being so, it is further urged that defendants' conduct is to be considered as negligent only in the failure to anticipate and take precautions against encountering downdrafts of the character which might cause injuries to passengers *"who had their seat belts secured."* But we suppose that a pilot in flying into a storm of violent turbulence may reasonably expect to encounter downdrafts of the violent character which might cause some injury to some passenger whether or not he had his seat belt secured. And the evidence permits the inference that the unbuckling of the seat belt was a circumstance occasioned by the conduct of defendants in flying the aircraft into the storm. Although there was substantial evidence tending to show plaintiff had unfastened her seat belt, plaintiff testified that she had fastened her seat belt when she first was seated in the plane and that she never unfastened her seat belt at any time "before this bump occurred." And "shortly" prior to her injury, plaintiff had become somewhat ill, as had Mrs. Cohen, and the stewardess had attended them—the stewardess testified that she adjusted Mrs. Cohen's seat and checked plaintiff's seat belt and found it to be fastened. The issue of plaintiff's contributory negligence in failing to keep her seat belt fastened or buckled was submitted to the jury by defendants' verdict-directing Instruction No. 4. The jury was required to find that plaintiff was sitting in seat number 12 with her seat belt securely fastened, in plaintiff's verdict-directing Instruction No. 2. Manifestly, the jury found for plaintiff and against defendants on these issues. Herein, we must accept as true plaintiff's testimony that she had not unfastened her seat belt at any time. And, since the evidence shows she was nevertheless violently thrown from her seat, we recognize as justifiable the inference that, the plane having been flown into the storm, her seat belt was in some way caused to be unbuckled and her person thrown from her seat by the violence of the storm.)

The stewardess testified that a short while before this "bad bounce happened," it was

rougher than theretofore; and for a few minutes before "this happened," the plane was in a "heavy" rainstorm.

After the severe jolt the stewardess and two passengers ministered to plaintiff. In doing this, they moved along the aisle on their hands and knees. Purses, spectacle cases, cigars, fountain pens, and cigarette lighters had been thrown from hands and pockets; and other movable objects such as pillows, blankets, and coffee or water jugs had been thrown about or displaced. Two other passengers, who were seated on the left, had been thrown from their seats. One had turned a complete somersault in the air and had come down in the aisle.

Midcontinent's meteorologist testified that about an hour preceding the flight, he had briefed the pilot, defendant Luckhurst. The meteorologist had completed his flight forecast at about one-thirty that morning. Light turbulence was forecast along the route with cumulus clouds at a high level. These cloud formations generally develop into thunderstorms. The meteorologist told the pilot the ceilings were around seventy-five hundred feet which indicated that the base of the thundershowers was pretty close to that level; and that in some of the heavier rain-shower strata, cumulus clouds were forming at approximately three thousand feet with occasional lowering to eight hundred feet. In the stated weather conditions with high-level cumulus clouds, described in the weather reports, thunderstorms develop and frequently there are columns of rain—"a column of water that's falling down." In such weather conditions, especially if such weather conditions are accompanied by lightning and heavy rain, "you expect to find downdrafts and updrafts." They could have been anticipated on this occasion. Generally, if the pilot can, he ought to avoid flying into such a situation. "That is generally a thing that we advise." Although a cell of violent activity in a thunderstorm may appear and dissipate within a period of, say, "twenty minutes," and another one may develop in a different area, yet where there is a thunderstorm and "if you decide to fly into it you're taking a chance as to whether you're * * * going to run into one of these so-called cells or not."

An experienced pilot, witness for plaintiff, testified that usually thunderstorms have vertical air currents in them. It is the custom of pilots, "if you have a thunderstorm accompanied by a heavy rainstorm and lightning * * * to avoid them if possible." But, "if they (pilots) do for some reason have to go through it," it is the custom to slow down. Reduction of speed should be made to a speed ("thirty percent or so") above stalling speed. The witness thought the speed to which the plane could have been reduced in our case would be "around a hundred twenty-thirty." The witness said, "If I thought I was going to hit the center of a thunderstorm, I would slow down as a precautionary measure"; and again, in referring to turbulence, he said, "Well, the * * * turbulence is * * * in a storm, it's there, and if you go through it at high speed it's rougher on the airplane and the passengers than it is if you go through it at a slower speed."

In approaching the vicinity of Tarkio defendants' airplane was being flown at the approximate altitude of three thousand feet (two thousand feet above ground level). Before the take-off the pilot had studied weather reports indicating "Light choppy-air, with high-level thundershowers in the vicinity of Tarkio," and, as stated, had been briefed by defendants' meteorologist. As the pilot continued his flight on to a point near Tarkio, he observed "cloud-to-cloud" lightning to the northward. The copilot had observed lightning overhead, primarily cloud-to-cloud, and occasionally cloud-to-ground. A few minutes before the "severe jolt" the plane went into rain. So far as he could recall, the pilot encountered rain at no other than the one point throughout the flight.

The pilot said he had no idea of "hitting anything like we did." He had the discretion so to do, and could have deviated from the prescribed course, and he could have slowed down the speed of the plane, but

he said there was no reason to do so, and "if I'd a-slowed down, I'd a-been late on my estimate, and we just don't operate that way if we can help it. You don't go along at half throttle through the air when you're trying to maintain schedules and flying the airlines and mail. What would be the object of doing that?"

As we have said, this court has heretofore reviewed and reversed a judgment for defendants rendered on a former trial of this case, and remanded the cause to permit plaintiff to plead specific negligence. There was no evidence introduced in the former trial that flying conditions were abnormal, or that any hazard was to be apprehended in flying into the wide thundershower area which lay for several miles across the airway of the airplane flight; nor was it possible to forecast danger of flying into downdrafts under the prevailing weather conditions as shown in evidence introduced in the former trial; and there was no evidence that any deviation from course or slackening of speed or any other action on the part of the pilot would have avoided the precipitous downdraft danger. Consequently, plaintiff at former trial was obliged to rely and vainly relied on the inference of negligence permitted by the doctrine of *res ipsa loquitur*. In the instant trial, as we have seen, evidence was introduced tending to show known weather conditions confronting the plane in flight portending danger, and plaintiff in supporting her case now relies on the evidence of specific conduct of defendants in failing to take precautions reasonably commensurate with the danger.

■ We have not been cited many cases treating with specific negligence of common carriers by air in flying passenger-carrying aircraft into a violent storm, or in failing to reduce speed of an aircraft in flight through a storm. Contributory negligence in these specific respects, among others, on the part of an airline (in the flight of its plane No. 44) was recognized and submitted to the jury in Northwest Airlines v. Glenn L. Martin Company, 6 Cir., 224 F.2d 120. See also, Hope v. United Air Lines, Inc., U.S.

D.C.W.D.Mo., not officially reported, 1937 U.S.Av.R. 179; and the unofficial report of the case, and the Note, Vol. 8, Journal of Air Law and Commerce, pp. 132–141. In the Hope case the district court submitted negligence of defendant in flying into a violent windstorm with rain wherein "dreadful air pockets" were encountered. Reeves, D. J., was of the opinion the testimony of plaintiff created an issue of fact for the jury as to whether the pilot had negligently precipitated the plane into the violent windstorm as described by plaintiff; however, the jury found for defendant and no appeal was taken. The ruling in the Hope case, that a *prima facie* case of negligence supported a submission, was referred to in the cited Note, Vol. 8, Journal of Air Law and Commerce, supra, at page 139, as the application of "the so-called mild form of *res ipsa loquitur*." However that may be, and, although the sciences of meteorology and of weather forecasting are improving along with the development of aeronautics, as yet it is too early to say that commercial airlines do not lurch and drop but for negligence. Cudney v. Midcontinent Airlines, supra. But where science does afford or comes to afford a forewarning of a weather condition attended by the probability or reasonable likelihood of a hazard of dangerous turbulence, it would be too much to say that the airline need not anticipate and take the commensurate precautions reasonably available to guard against the hazard; and where the means or precautions, in given circumstances, of avoiding the hazard of dangerous turbulence are known or are pointed out in the evidence to have been available, as in our case, the failure to take such specific commensurate precaution or precautions, in our opinion, constitutes negligence. These remarks, we think, are in alignment with the language of our decision upon former review and wherein this court additionally quoted from Small v. Transcontinental & Western Air, 96 Cal.App.2d 408, 216 P.2d 36, which quotation we now requote with added italics as follows, " 'It appears now to be common knowledge with regard to the operation of airplanes that

downdrafts, which vary in effect according to their extent, are not uncommon. It is true that such a manifestation of nature, like the weather, is commonly referred to as an act of God. So far as the weather is concerned it cannot be denied that airplane operators take every precaution against weather hazards. *If it is possible to determine or even suspect that under certain conditions downdrafts are likely or possible, it would appear to be the duty of a prudent operator to take whatever precautions are necessary or available to guard against dangerous consequences.'"* Cudney v. Mid-continent Airlines, supra, 254 S.W.2d at page 667.

Evidence introduced in the instant retrial of the Cudney case, which evidence we have set out, supra, is substantial in tending to show that the severe jolt which plaintiff experienced while a passenger on defendants' aircraft, the immediate physical cause of her injury, was occasioned by a violent downdraft which the plane had encountered after it had been flown for several minutes in a thunderstorm. Weather reports and forecasts had indicated that the route of the contemplated flight was through scattered cumulus cloud formations conducive to thunderstorms which occasion downdrafts. The probability or at least the possibility of thunderstorms with turbulence were forecast and could or should have been anticipated "in the vicinity of Tarkio." Precipitous drafts of disturbed air are the more probable where there is lightning, especially cloud-to-ground lightning and heavy rain. As the flight progressed from Kansas City toward Tarkio the turbulent air increased in the violence of its turbulence. Defendant Luckhurst in flying defendants' plane on its route in approaching the vicinity of Tarkio had or could have observed cloud-to-cloud lightning, as well as cloud-to-ground lightning. And, as stated, a few minutes before the "severe jolt," the airplane encountered rainfall which, according to the evidence, is all the more indicatory of the hazard of dangerous movement of air. Since the evidence reasonably supports the view that, although there were cloud formations over a wide area, a storm in nature likely to contain violently turbulent air was concentrating near Tarkio, it is not to be correctly urged, under the evidence in this case, that defendant pilot could not know of the storm and anticipate the likelihood of danger therein merely because "he couldn't see anything" after he flew into rain, and that, therefore, plaintiff may not recover. The evidence tends to show the pilot knew the forecast of stormy weather at Tarkio, saw or could have seen the lightning attending a storm, flew into heavy rainfall, and continued in flight in the rainfall. It may be reasonably inferred the rainfall was "heavy." The weather conditions reported and forecast, and the weather conditions experienced by the pilot in flight, all pointed to a thunderstorm with probably dangerous currents of air therein concentrated in the vicinity of Tarkio.

As we have seen, the pilot did not attempt to circumnavigate the hazard of a dangerous current of air within the storm, although such a hazard was likely; nor did he slacken the speed of his aircraft so as to lessen the dangerous effect of whatever turbulent "cell" of air obtained within the storm. On the contrary, he flew directly on in the airway at high and undiminished speed, although the evidence showed he had the discretion to deviate from the airway or to slacken speed of his aircraft which, as the evidence tends to show, he could have done and which, the evidence tends to show, airmen customarily do if possible when confronted by violently turbulent weather.

We have the opinion that, in the shown circumstances of this case, the jury could and did reasonably find defendants were negligent in failing to take the precaution to circumnavigate the turbulently stormy area or in failing to diminish speed in passing through the area, or in failing to do both.

The order setting aside the verdict and judgment for plaintiff and the judgment for defendants should be set aside and re-

versed, and the cause remanded with directions to reinstate the judgment for plaintiff as of the date of its original rendition. It is so ordered.

COIL and HOLMAN, CC., concur.

PER CURIAM.

· The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.