Thurman McKINNEY, Appellant,

v.

AIR VENTURE CORPORATION, Appellee.

No. 18015.

Court of Civil Appeals of Texas, Fort Worth.

March 1, 1979.

Rehearing Denied March 29, 1979.

Brown, Herman, Scott, Dean & Miles and J. Shelby Sharpe, Fort Worth, for appellant.

Jackson, Walker, Winstead, Cantwell & Miller and Robert F. Ruckman and H. Dudley Chambers, Dallas, for appellee.

## OPINION

HUGHES, Justice.

This appeal is from a wrongful death action involving the crash of a private plane on or about June 8, 1974. All six persons on board, including plaintiff's wife, were killed when the 1973 Piper Aztec crashed six miles northeast of Cresson, Texas while returning to Meacham Field in Fort Worth from a business trip to Lubbock. It is undisputed that the crash occurred when the plane encountered turbulence caused by a wind shear, (the leading edge of cold air outflow from the severe thunderstorms in the area). The jury refused to find the pilot's actions that night negligent and a judgment that McKinney take nothing was rendered.

We reverse and remand for a new trial. The jury here could properly have found negligence and, in this case, its failure to so find is unjust because it is against the overwhelming preponderance of the evidence.

This suit was filed by Thurman McKinney against Corpening Enterprises, the estate of A. V. Corpening, Jr., and appellee, Air Venture Corporation, for the wrongful death of his wife, Virginia. She was an employee of Corpening Enterprises, a sole proprietorship operated by A. V. Corpening, Jr. The plane was owned by Air Venture. Corpening was Air Venture's president and sole stockholder.

McKinney sued for actual and exemplary damages against all defendants jointly and severally. However, at the close of the evidence he dismissed Corpening Enterprises and the Corpening estate, and abandoned his claim for exemplary damages.

McKinney contends the pilot was negligent in encountering the thunderstorm activity and in failing to divert the plane to another airport prior to encountering the activity. The jury found that, while the pilot did fly the plane into intense thunderstorm activity and did not divert to another airport, these actions were not negligent. These negative findings are the basis of McKinney's two points of error. The jury also found that the flight in question was part of a joint enterprise between appellee, Air Venture Corporation, and A. V. Corpening, Jr., doing business as Corpening Enterprises; that the pilot was a borrowed employee of Air Venture on that occasion; that the pilot was then acting as an employee of Air Venture; and that $147,225.00 would fairly compensate McKinney for his wife's death.

■ McKinney claims the jury's negative findings on the negligence issues are against the great weight and preponderance of the evidence. Where the verdict is attacked as being against the great weight and preponderance of the evidence, the court of civil appeals has the duty to examine all of the evidence. If we find the verdict clearly unjust, we should remand the case for a new trial, even though the verdict is supported by more than a scintilla of evidence and even if reasonable minds could differ about the conclusion to be drawn from the evidence. Garwood, *The Question of Insufficient Evidence on Appeal*, 30 Tex.L.Rev. 803 at 805 (1952). *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ Flying an airplane is an activity not within the realm of experience of the ordinary prudent person or juror. Therefore, it is a suitable subject for expert testimony. In this case, six experts in various fields testified on the liability issues for both plaintiff and defendants. Two experienced pilots testified that, in their opinion, the pilot was negligent in encountering the storm activity. This was not contradicted with any pilot testimony but defendants sought to establish that the air traffic controllers did a substandard job that night in not conveying certain weather information to the pilot. Both sides introduced expert testimony as to the severity of the storm and agreed that a wind shear was the cause of the crash.

Several technical terms were used by various witnesses to describe this weather phenomenon: "cold air outflow", "wind shift line", "wind shear line", "shearline", "roll cloud", "fine line", "thin line", and "gust front". The terms "wind shear" and "cold air outflow" are used interchangeably. The term "gust front" is used in talking with pilots. We will use the term "wind shear".

The plane involved was a twin-engine Piper Aztec. The pilot held a commercial license for both single and multi-engine land aircraft, was instrument rated and a qualified flight instructor with over 3,000 flying hours as a pilot in command. The pilot was John Dittmaier.

The facts are undisputed in this case. The plane departed Meacham Field in Fort Worth the afternoon of June 8, 1974 on a business trip to Lubbock. Before departure, the pilot received a weather briefing from the local National Weather Service Forecast Office forecasting widespread thunderstorm activity that night along his

proposed return route of flight. After concluding their business in Lubbock, the pilot and his five passengers took off at approximately 10:30 p. m. to return to Meacham Field. A witness testified he heard the pilot say they "might hit a little wet whether on landing."

Shortly after takeoff, the Fort Worth Air Traffic Control Center recommended a change in route because of thunderstorm activity along the proposed flight path. The original flight plan called for the plane to fly over Guthrie and Bridgeport, and then to Meacham Field. The pilot was advised by the Center that it might be necessary to proceed as far south as Waco to circumnavigate the thunderstorms. The pilot was told that the weather in question extended from approximately twenty miles west of Millsap, to Wichita, Kansas, with the line moving slowly southeastward and building to the southwest.

The pilot requested additional weather information and was told by the controller that:

[I]t's not too bad in the metropolitan area but this thing is to the west, extends from, well the part that would affect you the most would be from Bridgeport to Millsap; that's pretty solid line out there, pretty—pretty heavy on the scope, ah I don't think I'd try to penetrate it myself if I were flying, they're forecasting at Carswell, (Carswell Air Force Base in west Fort Worth) for instance, within the next hour or so to go a thousand overcast with thunderstorms and hail and high winds.

The pilot accepted the suggested change in flight plan and turned the aircraft south toward Abilene. While in the Abilene area, the pilot contacted Abilene Flight Service Station requesting en route weather for Dallas. The Flight Service Station reported a solid line of thunderstorms from 10 to 15 miles wide extending from 25 miles southwest of Mineral Wells to Denton, moving eastward. Flight Service reported frequent lightning in clouds west through north of the Dallas area and read a forecast which called for thunderstorms and heavy rain showers and a wind shift after 10:00 p. m. In addition, the pilot was told that "Stephenville radar indicated tops of the clouds to be from 51,000 feet to around 59,000 feet."

Flight service then read the pilot two SIGMETs, Significant Meteorological Reports [1], which again warned of severe thunderstorms with cloud tops near 60,000 feet. Finally, the pilot was advised of severe thunderstorms en route to and at his destination. The pilot acknowledged these radio transmissions and "[a]dvised he would continue on." The pilot turned eastward toward Acton.

Shortly thereafter, Abilene Approach Control advised the pilot of weather activity approximately 35 to 40 miles ahead and at his "eleven o'clock position", slightly to the left of his course, (the twelve o'clock position being straight ahead). The pilot replied that he could see the activity on his aircraft's weather radar and requested permission to deviate south. Abilene Approach Control indicated that a deviation south would be approved.

The pilot continued to a point approximately 27 miles southwest of Acton and contacted Fort Worth Air Traffic Control Center. The pilot asked, "How does it look towards Meacham?" The air traffic controller replied that it was clear at that time with "everything just lying north of it on a southwest-northeast line." The pilot requested permission to proceed directly to Meacham Field and was cleared to do so at 11:50 p. m.

At 11:55 p. m., while flying in a northeasterly direction, the pilot reported seeing radar returns on the aircraft's radar scope approximately twenty miles ahead. The pilot requested a deviation to the southeast and, receiving no immediate response, requested a deviation to the south. At the

---

1. A SIGMET is a warning to be disseminated to all pilots of particularly hazardous flight conditions for all types of aircraft. These were issued by the Dallas-Fort Worth Weather Service.

same time, the pilot reported seeing something on his radar which looked "a little bit hairy" or "heavy". The controller approved a deviation to the south.

At approximately 11:59 p. m. the pilot reported seeing radar returns 18 or 19 miles ahead and asked the controller, "[w]hat does it look like from where you are?" The controller replied, "It looks pretty bad—its ah—just a mile north of Meacham right now." This transmission occurred approximately three minutes before the crash.

The pilot then asked how the weather looks on a direct line from his position to Meacham Field. The controller responded that it was clear at that time but added, "I couldn't guarantee it."

The pilot at this time was descending from 6,000 feet to the newly assigned altitude of 3,000 feet.

The final radio transmission from the pilot stated: "Sev _____ Seven Alpha Victor is deviating south we're _____ we're getting in, . . . ." The remainder of the radio transmission is unintelligible. The crash site was approximately 16 miles southwest of Meacham Field.

Expert witnesses for both McKinney and Air Venture agreed that the thunderstorm activity en route and at the planned destination was severe, and the weather reports characterized it as such. Plaintiff's expert witness Eggspuehler, a pilot, stated that the weather information given Dittmaier _____ the lightning in the clouds and cloud to cloud, the tops of the clouds being up to 60,000 feet, the dew point and temperature _____ clearly indicated to any pilot the storm's severity. Eggspuehler's testimony explained the implications of each piece of weather information to a pilot. He stated that the significance of the lightning reports was to tell Dittmaier that "[t]his is the most dangerous stage of a thunderstorm. [It] indicates that you have turbulence that may exceed the structural limits of an aircraft."

Expert witnesses for both sides agreed that the danger to aircraft in this situation from severe thunderstorm activity is the turbulence created ahead of the thunderstorm cells by the wind shear. Dr. Goldman, a defense expert weather witness, testified that the wind shear phenomenon is caused by cold air "generated from the evaporation of rain drops in dry air" rushing downward in a thunderstorm and spreading out as it strikes the ground. When this cold air flow meets warm air, the mixing action of the two air masses causes great turbulence.

Expert testimony from both sides agreed that the area of greatest turbulence is at the wind shear line—where the cold air outflow from the storm meets the warmer air in front of it. Plaintiff's expert weather witness Taft estimated that the wind shear encountered by the plane was in excess of 60 knots (approximately 69 m. p. h.).

Evidence established that a wind shear of the type which caused the crash is not present in every large thunderstorm, and, when present, may lie anywhere from within the storm itself to as much as 50 miles ahead of the thunderstorm cell. Eggspuehler, one of the pilots who testified as an expert witness, stated that because of the devastating effects when wind shear is encountered by light aircraft, pilots are taught to stay at least 15–20 miles away from all mature thunderstorms of the type present on the night in question. Dr. Goldman, a meteorologist, testified that the average cold air outflow would be expected to be between 10 and 25 miles out from the thunderstorm. He further testified that this outflow is usually confined to below the base of the clouds. In this case he estimated its height to be approximately 3,500 feet.

The testimony established that a wind shear line generally cannot be detected on most radars, including the airborne radar which the pilot had available. While during daylight hours, a wind shear can be sometimes detected visually by "raising dust", Dr. Goldman stated that at night the only way to know positively that there is one present in a storm is by a 180 degree wind shift on the ground.

Defendant introduced into evidence transcripts of government tapes of interphone

conversations between air traffic controllers and radio transmissions between the controllers and the pilot. These transcripts show that the controllers were aware of a wind shift on the ground at Meacham Field approximately 30 minutes before the crash.

The transcripts were prepared by defense witness Frank McDermott as part of his investigation. McDermott, who trained as an air traffic controller, is an aviation consultant specializing in aircraft accident investigation. He testified that, in his opinion, the handling of the flight by the controllers was "substandard". This attack on the controllers' performance is the primary basis for appellee's defense.

McDermott stated that he specifically referred to "not providing the flight with information known to the controllers on the weather and the movement of the weather through the area; and, in failing to provide the pilot with the weather in time for the pilot to make a decision as to what he should do for the safety of his flight." By this, he testified, he meant the information about the wind shift at Meacham which was not directly given to Dittmaier.

McDermott read into the record provisions of two Air Traffic Controllers' Manuals in which their duties and responsibilities in connection with weather information and handling of aircraft were discussed. He stated that the manuals, one for en route controllers and one for terminal controllers, have identical provisions. One section that McDermott read stated that controllers were to familiarize themselves with "pertinent weather information when coming on duty, and stay aware of current weather information needed to perform air traffic control duties."

He further testified that the manual stated that the controllers were to provide assistance in areas of "significant weather" by suggesting alternate routes to avoid them and to advise radar identified aircraft whenever "radar observation reveals a situation which, in your judgment, is likely to affect the safety of the aircraft." He also read a section of the manual which stated, "Issue pertinent information on radar observed weather, and chaff areas, and suggest radar navigational assistance to avoid these areas. Provide this assistance only when the pilot requests it, whether or not you have previously suggested it. Do not use the word turbulence in describing a condition in connection with weather echoes since radar scopes do not show areas of turbulence."

McDermott also identified defense exhibit 14 as a copy of a page from a controller's training manual dated September, 1973. He testified that training manuals were available for study by working controllers as well as trainees. Defendant then introduced the copy into evidence. It has text discussing hazards to aircraft from thunderstorms and a drawing of a cross section of a thunderstorm showing possible locations of turbulence.

McDermott testified that, when the controller learned of the wind shift at Meacham, he should have known that the "weather is moving through there" and that, with a storm of this type there "could be severe turbulence extending out as far as ten to twenty miles in advance of this movement, . . . ." He stated that instead of informing the pilot of the wind shift, they told Dittmaier he could probably make Meacham Field.

He read transmissions from the transcript that he characterized in his opinion as being an "inaccurate and misleading statement of the weather situation that the controllers knew existed, . . . ." In a transmission at 11:52 p. m., approximately 23 minutes after the wind shift at Meacham, Dittmaier asked, "[h]ow does it look over toward Meacham?" The controller said, "Well, on my radar it's in the clear right now, everything just lying north of it on a southwest-northeast line."

He explained that while a controller's radar is designed to minimize weather to the point that it only shows the "more concentrated forms", they are trained to know that "turbulent portions extend out well beyond what is actually showing on the scope", and the fact that Meacham Field appeared clear on his scope "would not de-

lude a trained controller into thinking that the airport was clear."

McDermott further criticized the information given by the controller in a transmission at 11:59 p. m. There, Dittmaier said, "[W]e're starting to paint some stuff about eighteen or nineteen miles ahead of us, what does it look like from where you are?" The Approach Controller [2] replied, "It looks pretty bad, it's uh, just about a mile north of Meacham right now." Dittmaier said, "OK, what about our present position direct Meacham, are we pretty clear as far as you can tell?" The controller replied "Well, at the present time it is, but, uh, I couldn't guarantee it." Dittmaier said "OK."

McDermott testified that, in his opinion, the controller gave Dittmaier a false impression of the location of the weather by telling him it was about a mile north of Meacham. He stated that in his opinion this conveyed the impression to the pilot that the weather was still north of Meacham when "in fact part of it had moved through thirty minutes prior to that." He then stated that in his review of the government tapes, there was no indication that Dittmaier was ever advised of the wind shift at Meacham but that the same controller advised another pilot of it.

We have examined these exhibits for ourselves and considered McDermott's testimony as to the effect to be given the controller's failure to inform Dittmaier directly of the wind shift at Meacham Field. This failure is the basis of McDermott's opinion and the crux of Air Venture's defense.

Our examination of the transcript shows that the same controllers who handled the doomed plane handled two Braniff flights and informed their pilots of a wind shift at "Regional Airport" (also referred to by the parties as D–FW).[3] However, the transcript also shows that the information given the Braniff pilots about the wind shift was

only in the context of informing them of a change in landing runway, (we assume necessitated by the change in the wind's direction). The transcript shows that even when discussing the wind shift among themselves, the controllers give it no special significance. According to the provisions in their manuals read into evidence by McDermott, the controllers could not have used the word "turbulence" in connection with informing a pilot of a wind shift anyway. On cross examination, McDermott stated that he was unable to say whether Dittmaier and the Braniff flights were on the same radio frequency (since they were handled by the same controller), and thus whether Dittmaier would have been able to monitor the information given them about the wind shift at Dallas—Fort Worth Regional Airport.

The page from the controller's training manual introduced into evidence by defendants does not mention the term "wind shift". It appears that the one time the term "wind shear" is used, it has reference to turbulence within a thunderstorm cell. The text under the picture states that "Surface gusts and rotor motion can be extremely hazardous to aircraft landing, taking off, and flying at low altitude."

Rotor motion is a reference to turbulence. Further, the testimony established, it is impossible to know, even if the wind conveniently shifts at a place where it can be observed, how far out the wind shear will extend from that point or how long it will be present.

McDermott testified that he had based his opinions on his experience as an air traffic controller and consultant. However, he stated that he had not been an active controller since 1953 nor had he ever controlled traffic in a modern radar environment.

Robert Rudich stated that he was presently a consultant in aircraft accident inves-

2. The Acton Controller handed Dittmaier off to Regional Approach Control at 11:58 p. m.

3. We take judicial notice of the fact that according to the Federal Aviation Administration,

D–FW or Dallas-Fort Worth Regional Airport is located between Dallas and Fort Worth and is approximately 16 nautical miles from Meacham Field.

tigation and he had a total of 26 years experience as an air traffic controller, including ten years as head of the Air Traffic Controller Investigation Section of the National Transportation Safety Board.

Rudich testified that, in his opinion, the controllers gave "[o]ne of the most complete disseminations of weather information that I've seen in . . . an accident." He also testified that in his opinion they furnished the pilot with adequate information concerning the weather that was ahead of his aircraft. Rudich's testimony, as McDermott's, was based on the government tapes.

He was asked about the conversation between the controllers at 11:29 p. m. concerning the wind shift at Meacham. The conversation, (the only one the controllers apparently had with each other on the subject), was as follows:

Acton Controller: "What's your altimeter now?"

Fort Worth Flight Service Station: "Looks like its on the rise, we've had a windshift here, looks like its south about three hundred degrees now[4], twenty, gusts to about thirty."

Acton Controller: "Uh, huh, OK, Thank you."

Fifteen minutes after this interphone conversation, Dittmaier established radio contact with the Acton Controller. In response to Dittmaier's question, "[h]ow does it look over by Meacham", the controller replied, "Well on my radar, its in the clear right now, everything just lying north of it on a southwest-northeast line".

Rudich was asked what the interphone conversation indicated to him as a controller. He stated that the wind shift to him was associated with the passage of a cold front "which was forecasted, which information had been provided to the pilot numerous times in weather briefings . . ." He further stated that the "three hundred degrees" meant that at some point the wind

had swung around to the northwest, and that the altimeter being on the rise indicated a frontal passage, "all of which was contained in various reports and forecasts provided to the pilot" particularly those provided to the pilot by the Abilene Flight Service Station.

He then testified that he found no fault with the air traffic controllers in not communicating the fact of the wind shift to the pilot because fifteen minutes after the interphone communication, when the plane first established radio contact with the Acton controller, the controller told the pilot that, on his radar, Meacham was "in the clear right now, everything just lying north of it on a southwest-northeast line."

Rudich testified that controllers are required to provide the pilot with "significant weather information", but that information concerning a wind shift is not "significant weather" as described in controller manuals in effect at that time. McDermott, as part of his testimony for the defense, had read into the record several excerpts from Air Traffic Control Manuals. McDermott's testimony took place after Rudich's and did not contradict this statement. Rudich also testified on cross examination that the controller was expected to advise the pilot of conditions which would make the landing hazardous, but that these would be hazards "of which he was aware, not that he thought might exist".

As previously mentioned, only plaintiff presented pilot testimony evaluating the conduct of the flight. The primary fact dispute in the case is whether Dittmaier, the pilot, should have turned at Acton Omni[5] in an attempt to reach Meacham Field in Fort Worth. Plaintiff's two expert pilot witnesses stated emphatically that in view of all the weather information Dittmaier had received, he should not have risked a close encounter with the storm activity. In response to the question of

---

**4.** Rudich testified that the word "south" was probably a mistranscription because it doesn't fit in with three hundred degrees, which indicated to him that the wind had swung around to the northwest.

**5.** A VOR (VHF Omni Range) transmitter or navigational aid located approximately 32 miles southwest of Meacham Field.

whether or not Dittmaier had been given sufficient weather information both pilots stated without equivocation that he had. They both further testified that they would have turned back at Acton Omni.

The first pilot witness was Jack Eggspuehler, Chairman of the Department of Aviation at Ohio State University, a flight instructor and pilot examiner for the Federal Aviation Administration. He has an instrument rating and approximately 9,000 hours of flight experience. The second pilot witness was William Bonnell, a retired American Airlines pilot with approximately 25,000 flying hours.

Eggspuehler was questioned extensively about the wind shear phenomenon. He testified that while a wind shift of 180° on the ground would indicate that the wind shear line had passed, he was not aware of any weather data that would definitely tell a pilot whether there was going to be a wind shear, or if there was one, where it would be located. But, he stated that the heights of the thunderstorm cells "would be indicative to a prudent pilot that he is going to have this outflow, that its going to be severe weather, and that extreme caution, more than usual should be exercised".

On direct examination he testified that, for as long as he had been flying, pilots had been taught that fifteen to twenty miles was a safe distance to remain clear of a well developed thunderstorm because of this outflow phenomenon. He further stated that it was his opinion that "most pilots are aware of the dangers that thunderstorms present, the characteristics of thunderstorms, and that there is a reasonably safe distance to maintain from well developed thunderstorms in order to assure the safety of the flight."

Defendant asked him, "if the pilot didn't know a wind shift [had occurred]—and, the pilot couldn't see that [wind shear line] on his radar, he would not have that information for a certainty, would he, sir?" Eggspuehler replied, "No. I would have to add, sir, that I don't see how the pilot could escape knowing that."

Evidence adduced that pilots and air traffic controllers have concurrent responsibilities in regard to flight safety. The record in this case reflects extensive testimony on this subject. All the expert testimony agreed that pilot decisions are not within the purview of air traffic controllers. Both sides further agreed that controllers cannot forbid a pilot to land because of weather. That is a pilot's decision. The cases which discuss the interrelationship of pilot and controller responsibilities hold that the pilot is primarily responsible for operation of the aircraft, but his responsibility is predicated on his being informed of all facts necessary for safe flight. Note, *Expanding Liability of Air Traffic Controllers,* 39 J. Air L. & Comm. 599 (1973).

From the evidence it is clear that Dittmaier made a decision as a pilot to continue to fly towards Meacham. The adverse weather conditions were forecasted, reported to him and confirmed by the pilot's own observations from his airborne radar.

We need not decide whether the controllers were required to relay to Dittmaier the information about the wind shift. The rest of the extensive information he received informed him of the storm's severity and location in relation to his flight path and destination. He made a decision as a pilot to risk the possibly devastating consequences of an encounter with a severe storm front that was one mile from his proposed destination and moving towards it. All of the information he had, combined with his experience as a pilot should have told him there was a substantial risk of encountering severe turbulence or other dangerous weather phenomena before he had completed a safe landing.

Air Venture urges that the plane was more than 17 miles from Meacham Field when it encountered the wind shear and thus outside of the 15 to 20 mile danger area of which Eggspuehler testified. In its brief, Air Venture states that "the aircraft encountered the turbulence associated with the cold air outflow which preceded the thunderstorm activity that was situated northwest of Meacham Field." Air Ven-

ture further states that "at the time the aircraft made its last transmission, the aircraft was 25 miles away from the radar echo." A close examination of the record and exhibits has caused us to disagree with these statements as they pertain to the location of the plane at the time of the crash in relation to the thunderstorm activity. We conclude from the testimony and exhibits that it is the plane's distance from the thunderstorm that is crucial, not the distance from Meacham.

Defendant's exhibit 2 and plaintiff's exhibit 1 indicated that both sides substantially agree on the approximate flight path of the aircraft during and just prior to the crash. The witnesses who constructed these exhibits were Eggspuehler and Dr. Goldman. They both testified that their exhibits were based on transcripts of radio transmissions between the pilot and air traffic control agencies along the route of flight.

The court has also carefully studied plaintiff's exhibits 17 and 18 prepared by expert witness Taft, a meteorologist. They consist of tracings from photographs of the storm as it showed on government radar. The photographs of the thunderstorm cells as they appeared on the radar scope were made by operators of a National Weather Service weather radar unit at Stephenville as a routine part of their duties. These exhibits indicate that the storm front was oriented on a line from southwest to northeast near the time of the crash. Defendant's exhibit 6, which included a chart depicting the location of the storm front, was constructed by Dr. Goldman, a meteorologist, by "transposing what was on the Stephenville film itself." This exhibit also indicated that the storm front was arrayed in a southwest to northeast line. The court was not presented with the rest of the parts of this exhibit which, according to Gold-

man's testimony, depicted the position of the storm front at various times before the crash. The reproduction of defendant's exhibit 6 before us indicates only the position of the storm front at 10:01 p. m. on the night in question. The other portions of the exhibit, which Goldman's testimony states were transparencies showing the position of the front at later times, were unfortunately not included in the record brought up to this court.

We conclude that the testimony and exhibits indicate that during the final minutes of the flight, the pilot was flying in a northeasterly direction roughly parallel to a solid line of severe thunderstorms approaching his flight path from the northwest.

This court has compared the flight path of the aircraft, as depicted on defendant's exhibit 2 and plaintiff's exhibit 1 with the weather information depicted on plaintiff's exhibit 17, which indicates the positions of the storm front at various times in relation to the crash site. We have concluded from measurements taken from the statute miles scale printed on the chart that both the flight path of the aircraft just prior to the crash and the crash site itself were within fifteen statute miles of the leading edge of the storm front[6] as plotted from radar reports at 11:43 p. m., approximately nineteen minutes prior to the crash.

This court has also carefully studied plaintiff's exhibit 18, which depicts the leading edge of the storm front at 12:02 a. m., approximately the time of the crash. Again, we concluded, using the same techniques as previously mentioned, that both the flight path of the aircraft just prior to the crash and the crash site itself lie within fifteen statute miles of the leading edge of the storm front as detected by radar.

6. The exhibit also shows what weather witness Taft referred to as the "thin line" extrapolated position for 12:02 a. m., the time of the crash. This "thin line" would be the cold air outflow ahead of the storm front, or wind shear. Taft stated that it was unusual for radar to be able to pick this up but by magnifying the radar films of this storm, he was able to do so at 11:00 p. m., 11:27 p. m., and 11:43 p. m., because of the storm's intensity. His extrapolation of the position of where this "thin line" should have been at 12:02 a. m., coincides with the site of the crash. However, the measurements herein discussed were made to the storm front itself, not to the "thin line" or wind shear line.

Defendants attempted to establish the location of the aircraft in relation to the storm by questioning Dr. Goldman about defendant's exhibit 4 which he had prepared. He testified that the exhibit accurately portrayed by scale the distance that the airplane was from the storm when it encountered the outflow. The scale, in nautical miles, showed that the plane was at approximately the exhibit's 8 mile marker when the pilot made his last transmission, and that the radar echo appeared then at about the exhibit's 25 mile marker.

When the exhibit was introduced Dr. Goldman testified he drew it in chart form to portray "the outflow from the squall line area of this particular case, relative to the location of the aircraft . . . ." However, he stated that it was a little distorted in order to give more vertical detail. Further, the exhibit shows an outline for the visible cloud being closer to the plane than the line depicting the radar echo of the storm as it showed on Stephenville radar. Goldman explained that radar detects less of the storm than actually exists because it "sees" rain particles rather than cloud particles. The actual front of the storm, not just its radar echo, was located on his exhibit at approximately the 22 mile mark. Therefore his exhibit, ignoring whatever effect the distortion he testified to would have had, showed the plane to be roughly 14 nautical miles from the actual storm front.

We conclude from an examination of defendant's exhibits 3 and 4 and Dr. Goldman's testimony that the purpose of these exhibits was not to establish how close the plane was to the storm front, but rather to illustrate what he stated to be his only opinion in this case: that the cause of the crash was that the aircraft encountered the weather that is associated with the leading edge of cold air outflow that is related to a thunderstorm.

Plaintiff's exhibit 16, a graphical presentation of the Stephenville weather radar films at the approximate time of the crash, and meteorologist Taft's testimony indicate that a solid line of thunderstorms was approaching the Fort Worth area. Taft indicated two areas in the line which contained the most significant thunderstorm cells associated with the storm front. An individual cell within the line was located west of Fort Worth. This cell was measured by radar to have a cloud top of 48,000 feet with hail indicated. According to Taft's testimony, this thunderstorm cell was moving "toward the east". We conclude that this cell was the most significant individual cell threatening the Fort Worth area although Taft also testified to and the exhibit showed a second large cell further away from the Fort Worth area "north of Dallas, up near McKinney".

The exhibits and testimony also clearly show that the wind shear, as identified by Taft from magnified radar pictures prior to the crash, emerged on a broad front from the line of thunderstorms and not only from the portion of the thunderstorm activity located northwest of Meacham Field.

We therefore find that, by turning northeast in the vicinity of the Acton Omni and thus flying roughly parallel to the line of thunderstorms, the pilot placed his plane within 15 statute miles of the approaching storm front off to his side. In summary, we conclude that the pilot was at the time of the crash, well within the 15 to 20 mile danger area described by both plaintiff and defense expert witnesses.

█ Air Venture's argument seems to be that, unless a pilot is positive a wind shear is present, he may fly as close as possible to thunderstorm activity, and so long as he does not penetrate the thunderstorm cell itself, his actions are not negligent. We disagree. From a careful study of the extensive testimony regarding this phenomenon, it appears that a wind shear is one possible part of a severe thunderstorm, just as rain, hail, lightning and turbulence within the cell itself are possibilities.[7]

7. On cross examination, plaintiff's weather witness Taft was asked if at any time "this aircraft

penetrated any of the dense echo thunderstorms themselves?" Taft replied that it did

■ The fact that a wind shear is somewhat more difficult to predict or detect than some of the other phenomena associated with a storm front of this size and intensity should cause a prudent pilot to exercise greater caution. This is especially true in situations like this where, as the evidence indicates, the pilot had access to information all of which indicated that the storm front in question was particularly severe. The principles stated by a Missouri court apply in this case:

"[W]here science does afford or comes to afford a forewarning of a weather condition attended by the probability or reasonable likelihood of a hazard of dangerous turbulence, it would be too much to say that the airline need not anticipate and take the commensurate precautions reasonably available to guard against the hazard; and where the means or precautions, in given circumstances, of avoiding the hazard of dangerous turbulence are known or are pointed out in the evidence to have been available, as in our case, the failure to take such specific commensurate precaution or precautions, in our opinion, constitutes negligence." *Cudney v. Braniff Airways,* 300 S.W.2d 412, 417 (1957 Mo.); 73 A.L.R.2d 371; 5 CCH Avi 17282.

Because of the possibility of extremely hazardous flight conditions in the vicinity of thunderstorms, such as were present that night, it has long been the practice of pilots to avoid them. The possibility of the presence of a wind shear is simply one of several reasons to avoid the area close to thunderstorms, especially that area lying directly in the storm's path. See Hardy, *Wind Shear and Clear Air Turbulence,* 42 J. Air L. & Comm. 165 (1976).

Further, in this case the evidence shows that the pilot had available to him several alternate airports not affected by the storm front and adequate fuel to reach them. Dittmaier's flight plan, filed prior to take off from Lubbock, showed he estimated the return trip would take one hour and thirty minutes and that he had five hours of fuel on board.

McKinney contends that this court is authorized to reverse and remand this cause solely on the basis of the allegedly uncontradicted testimony of his expert pilot witnesses that Dittmaier was negligent. He argues that their testimony falls within the rule stated in *Coxson v. Atlanta Life Ins. Co.,* 142 Tex. 544, 179 S.W.2d 943, 945 (1944). In that opinion the Supreme Court stated that:

"The judgments and inferences of experts or skilled witnesses, even when uncontroverted, are not necessarily conclusive on the jury or the trier of facts, unless the subject is one for experts or skilled witnesses alone where the jury or the court cannot properly be assumed to have, or be able to form, correct opinions of their own based upon the evidence as a whole and aided by their own experience and knowledge of the subject of inquiry." (Citing cases.)

We agree that the factfinder in aviation cases is often presented with issues requiring specialized knowledge to understand. However, because of our analysis of the record as a whole, we do not reach the question of whether the pilots' expert testimony was controlling. As to the probative force to be given it, the basic issue in the case was Dittmaier's conduct. The record shows that the other expert witnesses were not qualified to evaluate his conduct and did not attempt to do so.

■ We believe the expert pilot testimony submitted for the jury's consideration evidence tending to establish Dittmaier's negligence. This evidence was practically uncontradicted by other relevant and probative evidence. Based upon all the evidence submitted at trial, we conclude that the jury's failure to find the pilot negligent was either based upon a misapprehension of the effect of the evidence or that the great weight of it preponderated the other way.

---

not "enter into the echoes represented on the radar, which are precipitation shafts. Now, I think he got into part of the cloud formation, which may have extended out to the gust line, and *that is part of the thunderstorm.*" (Emphasis ours.)

Air Venture, in addition to arguing the negligence points, also advances by counterpoints other reasons why the take nothing judgment was proper and should be upheld. Its third counterpoint attacks the jury answers to special issues eight and nine, which dealt with whose employee the pilot was at the time of the crash. Air Venture claims there is no evidence to support the jury findings that, on the occasion in question, the pilot was its borrowed employee or was acting as its employee. McKinney contends that this attack against the jury's answers to special issues is contrary to Tex.R.Civ.P. 420 and 418. He argues that an appellee's proper mode of attacking jury findings is by cross points and since Air Venture's brief contains no cross points, we cannot consider them.

■ We disagree. Appellee is not conditionally attacking the judgment below. He is merely bringing forward other grounds which he contends support an affirmance of the judgment in his favor. The proper means to do this is by counterpoints. See O'Connor, *Appealing Jury Findings,* 12 Hous.L.Rev. 65 at 84–85 (1974). Passing upon Air Venture's no evidence points, we may only consider the evidence favorable to the jury findings. We have done this and believe that there is evidence to support the jury in its findings that the pilot's relationship was such as to hold Air Venture responsible for his conduct under the doctrine of respondeat superior.

■ While the evidence shows that John Dittmaier was listed on Corpening's payroll summary of 1974, he was the pilot on all occasions that Air Venture's plane was used. Air Venture was incorporated March 28, 1974. Dittmaier was hired in April of 1974. Several checks drawn on Air Venture's account and signed by A. V. Corpening, Jr., as its president were entered into evidence. They were made out to John Dittmaier for expenses. Dittmaier issued a memorandum on Corpening Enterprises stationery dealing with scheduling of Air Venture's plane. In evidence was an invoice from Air Venture, Inc. to Corpening Enterprises billing them for charter flights.

Also entered into evidence was a letter to A. V. Corpening from his attorney advising him to put both the pilot and the plane into a separate corporation to avoid liability. The evidence shows that Air Venture, while solely owned and operated by A. V. Corpening, Jr., nevertheless was properly incorporated under the laws of Texas. We conclude that however intertwined their business pursuits were, Air Venture and Corpening Enterprises maintained themselves as separate and distinct business entities.

Air Venture contends that its only connection with the trip in question was that it was the owner of the plane. It argues that the most that can be said is that there was some kind of bailment between Air Venture as bailor and Corpening Enterprises as bailee. It asserts that, while the record does not show precisely what arrangements were made to use its plane for this business trip, this is understandable as all persons with any personal knowledge of these details died in the crash. Therefore, there is nothing in the record to sustain McKinney's burden of proving that Dittmaier was any kind of employee of Air Venture in order to hold it responsible for Dittmaier's negligence, if any.

We disagree. We assume, without deciding, that Corpening as an individual may have had ultimate control over the destination and scheduling of Air Venture's plane. He would have had no reason to organize Air Venture as a corporation and then have it purchase an airplane unless it served his convenience. However, by Federal regulation, control of a flight was Dittmaier's, the licensed pilot. See 14 C.F.R. § 91.3 (1978). He controlled the plane when it was in use. His decisions as to the details of flight such as actual take off time, and operation of the plane in the air were not determined by Corpening Enterprises' business needs. They were rather independent decisions made depending on the plane's capabilities and prevailing flight conditions as, in his judgment as a pilot, these affected the safety of the plane and its passengers. Further, as a pilot it would have been unlawful under Federal regulations for him to sur-

render power or control over the actual operation of the plane entrusted to him by Air Venture. 14 C.R.F. § 91.3 (1978).

Under these facts, Air Venture's purchase of the plane would have been pointless without the employment of a pilot. No other purpose except piloting Air Venture's plane is shown for Dittmaier's employment. In other words he performed services for Air Venture by flying its plane for Corpening Enterprises. We therefore hold there is some evidence of probative value in the record to support the jury findings regarding whose employee Dittmaier was at the time of the crash.

Air Venture contends that while McKinney's two points of error are couched in terms of overwhelming weight and preponderance of the evidence, they are really no evidence points since the complaint is of rendition of the judgment. It further argues that since the complaints are really no evidence points, and McKinney permitted the accompanying proximate cause issues to be conditionally submitted upon affirmative answers to the negligence issues, the proximate cause issues are deemed to have been found against him by the trial court's judgment. We overrule these contentions.

McKinney's points of error are as follows:

### Point of Error One

The trial court erred in entering judgment in favor of Appellee based on the jury's answer to Special Issue No. 2 wherein the jury failed to find that the pilot was guilty of negligence in flying the aircraft into the intense thunderstorm activity since said answer is against the overwhelming weight and preponderance of the evidence so as to be manifestly unjust.

### Point of Error Two

The trial court erred in entering judgment in favor of Appellee based on the jury's answer to Special Issue No. 5 wherein the jury failed to find that the

pilot's failure to divert the aircraft to another airport immediately before flying the aircraft into the intense thunderstorm was negligence since said answer is against the overwhelming weight and preponderance of the evidence so as to be manifestly unjust.

 A review of the transcript shows that prior to entry of judgment McKinney filed a motion for judgment notwithstanding the verdict and motion to disregard jury findings. After judgment against him was rendered, he filed his motion for new trial attacking the jury's negative findings on the negligence issues as being against the overwhelming weight and preponderance of the evidence. The only relief he sought below and here is a reversal and a remand for a new trial. We agree with Air Venture that the language used to characterize a point of error is not controlling. Instead, the procedural steps below to which the points relate are determinative. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex.L.Rev. 361 (1960). By that standard, these points are insufficiency points rather than no evidence points and hence there are no deemed findings of proximate cause. *Strauss v. LaMark*, 366 S.W.2d 555 (Tex.1963). *Webb v. Jorns*, 530 S.W.2d 847, 854 (Tex.Civ.App.—Fort Worth 1975, writ ref'd n. r. e.).

Air Venture further contends that regardless of the merits of McKinney's points, it is immune from this action as a matter of law. It claims immunity because the jury allegedly found it to be an agent of Corpening Enterprises, Mrs. McKinney's employer, a subscriber under the Texas Workmen's Compensation Act. According to Air Venture, it is an agent of Corpening Enterprises because the jury found that they were acting as a joint enterprise "in the operation of the aircraft in question". It argues that the Texas doctrine of joint enterprise or joint venture makes each party thereto the agent of the other for purposes of tort liability [8].

---

8. The parties in this case use the terms joint enterprise and joint venture interchangeably.

While it does not affect our decision, since we are remanding this case for a new trial we note

It notes that Tex.Rev.Civ.Stat.Ann. art. 8306 § 3 (1967), states that employees "shall have no right of action against such subscribing employer or his agent, . . . for damages for injuries resulting in death . . . ." In the trial court Air Venture pleaded that, by virtue of having received death benefits under the Act, McKinney had no cause of action against it for ordinary negligence. It was stipulated at trial that Corpening Enterprises was a subscriber under the Act and that Thurman McKinney had been paid full death benefits.

■ Air Venture reasons that since the jury found in effect that it was an agent of Mrs. McKinney's employer, a subscriber under the Act, it follows as a matter of law that it is immune from this action. However, the Texas Supreme Court has held that an injured claimant may be entitled to recover in a third party action even though the defendant would be regarded as an employer's agent for some purposes. *McKelvy v. Barber,* 381 S.W.2d 59 (Tex. 1964). In order to gain the immunity afforded by Tex.Rev.Civ.Stat.Ann. art. 8306 § 3 (1967), the person seeking it must be "one for whose conduct the employer would, aside from the Workmen's Compensation Act, be legally responsible under the doctrine of respondeat superior." *McKelvy, supra,* at 62. The Supreme Court went on to state that an important consideration was whether the employer had the right to control physical details as to the manner of performance which is characteristic of the master-servant relationship. *McKelvy, supra,* at 63.

As stated earlier in this opinion, we do not find that Corpening Enterprises controlled the details of the operation of the plane in flight. The jury question, together with the answer, was as follows:

*QUESTION NO. 7*:

At the time of the occurrence in question, was Air Venture, Inc. and A. V. Corpening, Jr., d/b/a Corpening Enterprises acting as a joint enterprise in the operation of the aircraft in question?

"Joint enterprise" means: (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

Answers "Yes" or "No".

ANSWER: *YES*

■ We hold that the furnishing of the plane for the business trip did not place its operation in flight under the control of Mrs. McKinney's employer. Further, Corpening was not in general responsible for the actions of Air Venture under the doctrine of respondeat superior. He incorporated Air Venture on the advice of his lawyer to avoid any individual liability that he might incur since he ran Corpening Enterprises as a sole proprietorship. Therefore, we hold that Air Venture was not an agent of Mrs. McKinney's employer for purposes of the Workmen's Compensation Act.

We have carefully examined all the intelligible exhibits and all of the testimony, viewing the record as a whole and in the light most favorable to the verdict. *In re King's Estate, supra.* Further, in a case like the one we have here, it is not enough that it is unclear that the verdict is right, rather it must clearly appear that the verdict is wrong. *Phipps v. Evans,* 262 S.W.2d 430 (Tex.Civ.App.—Waco 1953, writ ref'd n. r. e.).

The question here then is: "[D]o the evidence and attending circumstances so strongly negative the exercise of any care on the part of the appellee as to lead to the conclusion that the jury were laboring under some misapprehension or improper motive or influence in arriving at their verdict?" *Gulf, C. & S. F. Ry. Co. v. Wilson,* 59 S.W. 589 at 591 (Tex.Civ.App.1900, writ dism'd).

there are some differences. See 58 Am.Jur.2d *Negligence* § 465 (1971); Keeton, *Imputed Contributory Negligence,* 13 Tex.L.Rev. 161 at 163

(1935); 40 Tex.Jur.2d *Negligence* § 95 (1976); 46 Am.Jur.2d *Joint Ventures* § 5 (1969).

■ While the appellate courts of this state should be careful not to invade the province of the jury, they are empowered to set aside a verdict based on insufficient evidence or when the facts disclosed show that it was manifestly against the truth of the case. *Gulf, C. & S. F. Ry. Co. v. Wilson, supra.* For the reasons given above, we are of the opinion that this verdict was against the weight of the evidence and the interests of justice require a new trial.

Reversed and remanded.